Timothy A. Loranger, State Bar No. 225422
Ari S. Friedman, State Bar No. 256463
WISNER BAUM LLP
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
Telephone: (310) 207-3233
*tloranger@wisnerbaum.com*
*afriedman@wisnerbaum*
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AMBER SAX, individually, as Successor-in-Interest of John J. Sax, and as guardian ad litem for the surviving children of John J. Sax; AVERY RASMUSON, individually, as Successor-in-Interest of Seth D. Rasmuson, and as guardian ad litem for the surviving child of Seth D. Rasmuson; EMILY BAXTER, individually and as Successor-in-Interest of Nathan E. Carlson; WAYLAND B. STRICKLAND, individually and as Successor-in-Interest of Evan A. Strickland; MICHELLE A. STRICKLAND, individually and as Successor-in-Interest of Evan A. Strickland; MICHAEL LOSAPIO, individually, and as Successor-in-Interest of Nicholas P. Losapio; SUSAN LOSAPIO, individually, and as Successor-in-Interest of Nicholas P. Losapio, *Plaintiffs,* <br><br> *v.* <br><br> BELL TEXTRON, INC.; THE BOEING COMPANY; and ROLLS-ROYCE CORP., *Defendants.* | **CASE NO. 3:24-cv-00906-BJC-BJW** <br><br> **THIRD AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

**<u>THIRD AMENDED COMPLAINT</u>**

1. This case arises from the fatal crash of a U.S. Marine Corps V-22 "Osprey" aircraft with Bureau Number 168018 which was assigned callsign "SWIFT 11."

2. On June 8, 2022, SWIFT 11 suffered a catastrophic failure in-flight and a subsequent impact with terrain tragically killing Plaintiffs' decedents, who were the aircraft's crew during a training mission (the "Accident").

**THE PARTIES**

3. Plaintiff AMBER SAX is a citizen and resident of the State of California, and she is the widow of Captain John J. Sax, United States Marine Corps, deceased, and the natural mother and guardian ad litem of E.S. and E.S., minors.



John J. Sax

4. E.S., a minor, is the first-born natural child of Plaintiff AMBER SAX and Plaintiff's decedent Captain John J. Sax, deceased.

5. E.S., a minor, is second-born natural child of Plaintiff AMBER SAX and Plaintiff's decedent Captain John J. Sax, deceased, with the same initials as their first-born child.

6. Decedent Captain John J. Sax was, at the time of his passing, a citizen of the State of California.

7. Plaintiff AVERY RASMUSON is a citizen and resident of State of Montana and she is the widow of Corporal Seth D. Rasmuson, United States Marine Corps, deceased, and the natural mother and guardian ad litem of R.R., a minor.



Seth D. Rasmuson

8. R.R., a minor, is the natural child of Plaintiff AVERY RASMUSON and Plaintiff's decedent Corporal Seth D. Rasmuson.

9. Decedent Corporal Seth D. Rasmuson was, at the time of his passing, a citizen of the State of California.

10. Plaintiff EMILY E. BAXTER is a citizen and resident of State of North Carolina, and she is widow of Corporal Nathan E. Carlson, United States Marine Corps, deceased.



Nathan E. Carlson

11. Decedent Corporal Nathan E. Carlson was, at the time of his passing, a citizen of the State of California.

12. Plaintiff WAYLAND B. STRICKLAND is a citizen and resident of State of New Mexico, and he is the natural father of Lance Corporal Evan A. Strickland, United States Marine Corps, deceased.



Evan A. Strickland
*1*

13. Plaintiff MICHELLE A. STRICKLAND is a citizen and resident of State of New Mexico, and she is the natural mother of Lance Corporal Evan A. Strickland, United States Marine Corps, deceased.

14. Decedent Lance Corporal Evan A. Strickland was, at the time of his passing, a citizen of the State of California.

15. Plaintiff MICHAEL LOSAPIO is a citizen and resident of the State of New Hampshire, and he is the natural father of Captain Nicholas Losapio, United States Marine Corps, deceased.



Nicholas P. Losapio

16. Plaintiff SUSAN LOSAPIO is a citizen and resident of the State of New Hampshire, and she is the natural mother of Captain Nicholas Losapio, United States Marine Corps, deceased.

17. Decedent Captain Nicholas Losapio was, at the time of his passing, a citizen of the State of New Hampshire.

18. Defendant BELL TEXTRON, INC. ("BELL") is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 3255 Bell Flight Blvd., Fort Worth, Texas 76118.

19. Defendant BELL is registered to do business in the State of California with Secretary of State File Number 1112059.

20. Defendant BELL conducts substantial and not isolated business in this State and District, and it maintains a registered agent in California as follows: The Corporation Company, 555 Capital Mall, Suite 1150, Sacramento, California 95814.

21. Defendant THE BOEING COMPANY ("BOEING") is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 929 Long Bridge Drive, Arlington, Virginia 22202.

22. Defendant BOEING is registered to do business in the State of California with Secretary of State File Number 367504.

23. Defendant BOEING conducts substantial and not isolated business in this State and District, and it maintains a registered agent in California as follows: CSC – Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Sacramento, California 95833.

24. Defendant ROLLS-ROYCE CORPORATION ("RRC") is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 450 South Meridian Street, Indianapolis, Indiana 462205.

25. Defendant RRC is registered to do business in the State of California with Secretary of State File Number 1867640.

26. Defendant RRC conducts substantial and not isolated business in this State and District, and it maintains a registered agent in California as follows: CSC – Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Sacramento, California 95833.

27. Defendants BELL, BOEING, and RRC are referred to collectively herein as "Defendants" unless otherwise specified.

**JURISDICTION AND VENUE**

28. This Court has subject matter jurisdiction of this matter pursuant to Article I, § 8, cl. 17 of the United States Constitution, because the incident occurred in a federal enclave, namely Range 2512 which is located on land that lies beneath the airspace of Restricted Area 2512. The incident occurred in one of two areas designated for live aerial gunnery training, specifically the area called Inky Barley. (See *Willis v. Craig,* 555 F2d 724, 726 (9th Cir. 1977); *Celli v. Shoell,* 40 F.3d 324, 328 (10th Cir. 1994).)

29. The incident occurred within Range 2512, which is a federal enclave located wholly within Imperial County within the State of California. Range 2512 is operated, controlled, maintained, and secured by the Federal Government, through the Department of the Navy.

30. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Parties.

31. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 exclusive of interest and costs.

32. This Court has personal jurisdiction over all Defendants, and each of them individually, by virtue of California Code of Civil Procedure 410.10 consistent with the Due Process clause of the United States Constitution because all Defendants, and each of them individually, have purposefully availed themselves of California's benefits, the claims stated herein arise out of or relate to Defendants' contacts with the forum, and the exercise of jurisdiction over Defendants by this Court comports with traditional notions of fair play and substantial justice, because Defendants:

a. are registered to do business in California as alleged in paragraphs 21 through 27;

b. operate, conduct, engage in, or carry on a business in this state or have an office in this state, and employ California residents who work in this state;

c. breached a contract in this state by failing to perform acts required by the contract to be performed in this state, and Plaintiffs and their decedents are third-party beneficiaries of said contracts;

d. placed defective products that caused harm in this state into the stream of commerce, and they have the requisite minimum contacts here such that they should fairly anticipate being hauled into court here;

e. committed tortious acts and/or omissions that resulted in the wrongful deaths of service members in this state;

f. contracted with the U.S. Government to deliver products, goods, and/or services to California in connection with military aircraft in general and V-22 Osprey aircraft in particular to military bases within California including Marine Corps Air Station Camp Pendleton California, Marine Corps Air Station Miramar, California, Naval Air Station North Island California, Naval Air Station Point Mugu California, and Edwards Air Force Base California;

g. sent their respective employees and/or agents who are technical representatives "TECHREPS" for military aircraft in general and V-22 Osprey aircraft in particular to military bases within California including Marine Corps Air Station Camp Pendleton California, Marine Corps Air Station Miramar California, Naval Air Station North Island California, Naval Air Station Point Mugu California and Edwards Air Force Base California;

h. maintain a network of multiple authorized dealers, maintenance, support, and service centers within California to sell and service Defendants' products in-state;

i. targeted California through advertising and marketing efforts, including attending and participating in aviation trade shows within the state, and have sold their products in California as a result of said efforts; and/or

j. litigated multiple lawsuits in California courts as both a plaintiff and defendant over the years.

33. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District near Glamis, Imperial County, California.

34. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c)(2) because all Defendants, and each of them, are deemed to reside here and are subject to the Court's personal jurisdiction here.

35. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c)(2) because all Defendants, and each of them, have the capacity to sue and be sued here.

## FACTUAL BACKGROUND

### A. BACKGROUND OF THE V-22 "OSPREY" AIRCRAFT

36. The V-22 Osprey aircraft is a land- and sea-based, tiltrotor, multi-mission aircraft operated by the United States Marine Corps, Navy and Air Force.

37. The V-22 Osprey carries a crew of between three and five crew members, depending upon the mission assigned.

38. The V-22 Osprey does not have ejection seats or parachutes to facilitate crew egress in the event of a catastrophic emergency.

39. Rather, in the event of a catastrophic emergency the crew must engage in a forced landing on land or water.

40. The V-22 Osprey's tilting "proprotors" allow the aircraft to takeoff or land vertically, like a helicopter with rotors, but fly horizontally in forward flight like an airplane with propellers.



***Photo of V-22 in vertical flight***




***Photo of V-22 in forward flight***

41. The complex moving engine and proprotor system has a transmission-type system that is supposed to provide redundancy and power to both proprotors in the event that one engine fails.

42. The vertical flight characteristics of the V-22 Osprey are supposedly advantageous over a traditional airplane because they supposedly allow for takeoff and landing without a runway or airport.

43. The forward flight characteristics of the V-22 Osprey are supposedly advantageous over a traditional helicopter because they supposedly allow for faster transit.

44. However the aircraft, as fielded, has failed and continues to fail to meet the government's safety and reliability specifications and requirements and the aircraft is not safe in the vertical operating mode, horizontal operating mode, or any transitional or other operating mode in between.

45. On Thursday, September 28, 2023 the United States Department of Justice announced that The Boeing Company resolved "allegations that it violated the False Claims Act by submitting false claims and making false statements in connection with contracts with the U.S. Navy to manufacture the V-22 Osprey, a tiltrotor military aircraft." **(Exhibit A, Dept. of Justice Press Release Sept. 23, 2023)**.

46. On December 31, 2023 the United States House of Representatives' Committee on Oversight and Accountability sent a letter to the Secretary of Defense summarizing the safety and reliability problems with the Osprey and requested eight categories of documents related to Osprey safety. **(Exhibit B, Letter, Dec. 21, 2023)**.

**B. <u>Background of the Defendants</u>**

47. Defendants BELL and BOEING are the general contractors that jointly design, manufacture, and assemble V-22 Osprey aircraft in or near Philadelphia, Pennsylvania and Amarillo, Texas.

48. Defendant RRC is the contractor that designs, manufactures, and assembles, V-22 Osprey engines, which are model AE1107C turboshaft engines, and related components and systems which provide power to both proprotors, in or near Indianapolis, Indiana.

49. The RRC AE1107C engine, originally designed as the Allison T406 engine, has several variants, is a commercially available aircraft engine, and is not unique to military operations.

50. Defendant RRC provides its aircraft engines and their component parts to various locations in California.

51. Defendants BELL, BOEING, and RRC supply, maintain, troubleshoot, and repair V-22 Osprey aircraft, engines, and their component parts in California.

52. Defendants BELL, BOEING, and RRC maintain a regular presence in California through their TECHREPS who assess, maintain, troubleshoot, and repair V-22 Osprey aircraft, engines, and their component parts and/or assist with their assessment, maintenance, troubleshooting, and repair.

## C. RELEVANT AIRCRAFT SYSTEMS BACKGROUND

53. The V-22 Osprey is designed, manufactured, and produced by Defendants BELL and BOEING to perform its mission in all weather conditions, during the day and at night, and it is specifically designed, manufactured, and produced to conduct flight operations in very close proximity to the ground and/or water.

54. The RRC engine output power is controlled by a Full Authority Digital Engine Control ("FADEC") and that engine power is transferred to the proprotors by a torque shaft through a clutch assembly and gearboxes.

55. The FADEC can automatically command an engine shutdown without authority or command from the pilot.

56. A clutch assembly failure due to internal slippage results in a Hard Clutch Engagement ("HCE") which results in severe damage to the drive system components on the affected side.

57. The internal slippage in the clutch assembly is caused by a faulty clutch component known as an Input Quill Assembly that does not meet the government's specifications for operation, durability, endurance, or reliability.

58. The BELL/BOEING design, manufacture, production, and/or assembly of the V-22 Osprey aircraft includes a system that is meant to automatically transfer power from one engine to both proprotors in the event that one engine fails.

59. The system described above is called the Interconnect Drive System (ICDS).

60. The ICDS concept is not unique to the Osprey and has been used in other applications safely for years.

61. However, the Osprey's ICDS is flawed, unsafe, and does not meet the government's specifications for safety and/or reliability.

62. The Osprey's ICDS also lacks redundancy, contributes to catastrophic systems failure, and grossly fails to meet specifications, because it allows a HCE on one side to initiate a HCE on the other side which results in the assured loss of the aircraft and occupants with no corrective action available to the brave military pilots and crew, who are along for the ride to their deaths.

## D. <u>THE ACCIDENT AT ISSUE IN THIS COMPLAINT</u>

63. While on a training mission during the day with good weather within the Continental United States, specifically Southern California, on June 8, 2022,

SWIFT 11 suffered a single HCE that, due to the Osprey's lack of compliance with specifications, cascaded into a catastrophic dual HCE event and an uncontrollable asymmetric thrust condition.

64. SWIFT 11 tragically impacted the ground at 12:14 p.m. on territorial lands owned by the United States federal government, specifically at Target 68 (Inky Barley) within Range 2512.

65. SWIFT 11's catastrophic mechanical failure and crash was not caused by the pilots or aircrew.

66. SWIFT 11's catastrophic mechanical failure and crash was not caused by improper maintenance.

67. The components that failed on SWIFT 11 were in the same condition on the day of the accident as the day they left Defendants' factories and/or control.

68. There were no prior indications or warnings to the pilots or aircrew of Swift 11 that a dual HCE event would occur.

69. Due to the Osprey's lack of compliance with government specifications, the SWIFT 11's pilots and crew were powerless to counteract the aircraft's uncontrollable asymmetric thrust condition where there was a sudden loss of thrust on the right proprotor and positive thrust on the left proprotor.

70. Due to the Osprey's lack of compliance with government specifications, SWIFT 11's right engine FADEC shut down the right engine without command from the pilot during the dual HCE event.

71. Due to the ICDS's lack of redundancy and compliance with government specifications, power was not transferred from the operational left engine to the inoperative right proprotor.

72. Due to their defective products, breaches of contracts, breaches of warranties, wrongful actions and omissions, the defendants named herein caused the Accident and the tragic deaths of Plaintiffs' decedents, five fine young United States Marines.

## E. **BACKGROUND OF THE OSPREY'S AIRWORTHINESS CERTIFICATION AND DEFENDANTS' ROLE.**

### 1. **Bell and Boeing Tilt-Rotor History**

73. In 1955 Defendant BELL's predecessor company, Bell Aircraft Corp., contracted with the military to produce an early tiltrotor prototype, the XV-3. The Bell XV-3 program failed after 13 years of testing due to severe oscillations and vibrations, caused by the edgewise movement of the rotor during forward flight.

74. Meanwhile, in 1956, Defendant BOEING's predecessor, the Boeing Vertol Company of Morton, Pennsylvania, conceived and fielded another tiltrotor prototype **for the military**, the VZ-2. While the Boeing program was more successful than Bell's, its prototype produced high blade, hub, and transmission

component loads, which imposed weight or life cycle penalties that were unacceptable.

75. In 1981 the Department of Defense established the Joint-Service Vertical Take-Off/Landing Experimental Program (JVX), which was initiated by the military's desire for an aircraft with vertical lift and long-range capability.

76. In 1983 Bell Helicopter and Boeing Vertol were selected to jointly develop this military tiltrotor design. On January 15, 1985, the JVX aircraft was designated the V-22 Osprey, the U.S. Navy and Marine Corps were assigned leadership of the program.

77. The Naval Air Systems Command (NAVAIR) was designated as the airworthiness approval authority and, in May 1986, NAVAIR awarded a $1.714 billion fixed-price contract to the Bell-Boeing joint venture for full-scale development.

78. The original V-22 Osprey program also failed miserably; early prototypes crashed during testing; rework was ordered to improve safety. In 1992, six years after the initial contract award, extensive Engineering and Manufacturing Development was ordered for safety; the redesigned aircraft was designated the V-22B in June 1994. In 2000, during initial operational testing, two fatal Osprey (V-22B) crashes killed 23 Marines.

79. In 2005, eleven years after the safety rework was ordered, the military ordered full-rate production. The aircraft achieved Initial Operating Capacity (IOC) in June 2007, twenty-four years after Defendants BELL and BOEING were jointly contracted to build the aircraft.

80. Looking back to the first BELL and BOEING tiltrotor prototypes in the 1950's, the Osprey development was a full fifty-two years in the making, with too many crashes, mishaps, incidents, accidents, and engineering modifications to count.

81. Through this entire time, and especially from June 1994 to June 2007, when NAVAIR granted IOC certification for the second iteration of the Osprey, the V-22B, Defendants BELL and BOEING misrepresented the safety, reliability, and longevity of this aircraft.

82. In 2000 the Department of Defense Inspector General (DODIG) identified 22 major deficiencies in the Osprey including unacceptable "mean time between failure" rates. (Rpt. No. D-2000-174).

83. In 2011 the DODIG conducted an audit that investigated the reliability and availability of Osprey aircraft. (DODIG Project D2011-DOOOLH-0170.000). The report of this audit is not available publicly.

**2. RRC-Royce Engine History**

84. In 1944 the Allison Engine Division of General Motors ("Allison"), located in Indianapolis, Indiana, began producing and testing gas turbine engines for the military.

85. In December 1985 NAVAIR selected Allison as the Osprey's engine designer, developer and manufacturer.

86. Allison's Osprey engine is a derivative of the existing AE 1107 engine design, which achieved Federal Aviation Administration (FAA) certification for civilian use.

87. In 1995, RRC-Royce acquired Allison, creating the company now known as Defendant RRC.

88. In 2009 the Government Accountability Office (GAO) documented that Osprey engines, as a standalone product, had reliability issues where engines would fail prematurely and failed to meet reliability specifications. (GAO-09-326P and GAO-09-694T).

**F. THE SPECIFIC DOCUMENTS THAT CONTAIN DEFENDANTS' INTENTIONAL MISREPRESENTATIONS AND/OR OMISSIONS**

**1. Flight Clearance Documentation**

89. At some time **before** the IOC certification in 2007, the Osprey was required to obtain a military **"Flight Clearance"** in accordance with Naval Air Systems Command Instruction (NAVAIRINST) 13034.1.

90. There are multiple types of Flight Clearances that can be issued. NAVAIRINST 13034.1.

91. The Osprey's Flight Clearance documentation and the specific dates of the Flight Clearances are **not** available to Plaintiffs and **not** publicly available, but they are known and/or in the possession of the Defendants.

92. According to NAVAIRINST 13034.1, a Flight Clearance is a formal document **"that provides an assurance of airworthiness/safety of flight and ensures risk has been identified . . . ."** NAVAIRINST 13034.1D ¶ 6(a)(1).

93. The Navy's flight clearance process **"shall utilize data from the Original Equipment Manufacturer (OEM)"**. NAVAIRINST 13034.1D ¶ 6(a)(8).

94. The BELL and BOEING joint venture is the OEM for the Osprey airframe and proprotors.

95. RRC is the OEM for the Osprey's engines.

96. The specific data required from the OEMs for Flight Clearance include airframe data, engine data, and engine/airframe integration data:

a. data and analysis about aircraft loads and strength;
b. data and analysis about service life and reliability of the entire aircraft and its component parts;
c. data and analysis about vibrations, flutter, and divergence;
d. data and analysis about vibration, thermal, and acoustic fatigue;

e. data and analysis about Powerplant (i.e. – engine) effects;

f. data and analysis about system safety hazards including a formal Hazard Risk Analysis (HRA) and a formal System Safety Assessment (SSA).

**2. <u>Failure Modes, Effects, and Criticality Analysis</u>**

97. Before Flight Clearance was obtained, BELL, BOEING, and RRC, jointly, were required to publish a document called **the "Failure Modes Effects and Criticality Analysis" (FMECA)** and provide that document to NAVAIR.

98. Military Standard (MIL-STD)-1629 sets forth the procedures for a FMECA generally; Joint Service Specification Guide (JSSG)-2001 sets forth specific requirements for a FMECA for all "AIR VEHICLES."

99. The FMECA is "an essential function in design" which "must be iterative to correspond with the nature of the design process itself." MIL-STD-169A, Forward.

100. The Osprey FMECA underwent several revisions.

101. The specific dates of the Osprey's FMECA original issue and revisions, as well as the documents themselves, are **not** available to Plaintiffs and **not** publicly available, but they are known and/or in the possession of the Defendants.

102. At some time before the Osprey's initial operational testing in the year 2000, BELL, BOEING, and RRC, jointly, through their representatives and/or

agents, sent NAVAIR a FMECA for the **final** Osprey design that was submitted for Flight Clearance. The final FMECA was sent to Patuxent River Naval Air Station in Patuxent, Maryland for the government's review and verification.

103. **Within the FMECA, BELL and BOEING were required to identify "Critical Safety Items" (CSI's)**. JSSC-2001B § 3.3.10.3

104. The term "Critical Safety Item" means an item that contains critical characteristics where any failure, malfunction, or absence of that characteristic could cause a catastrophic **or** critical failure resulting in the loss of or serious damage to the aircraft, an unacceptable risk of personal injury or loss of life, **or** an uncommanded engine shutdown that jeopardizes safety. JSSC-2001B § 3.3.10.3.

### 3. Interface Control Document (ICD)

105. **Engine manufacturer Defendant RRC was required to collaborate with the BELL and BOEING joint venture to ensure "Engine compatibility and installation" such that the "installed engine shall provide a safe, compatible, and maintainable interface with the [aircraft] under all [aircraft] operating conditions."** JSSG-2001B § 3.3.1.1.

106. In their collaboration RRC, BELL, and BOEING were required to generate an **"Interface Control Document (ICD)"** that evolves over the engineering and development phases. JSSG-2001B § 4.3.1.1.

107. For the **RRC engine** specifically, "the subsystems that are typically required to interface and function with the engine include, accessory drive, starting, APUs, ***transmissions***, ***gearboxes***, hydraulic, electrical power, ***flight controls***, fuel, ***vehicle control and management***. . ." and others. JSSG-2001B § 4.3.1.1 (emphasis added).

108. The specific dates of the Osprey's engine ICD original issue and revisions are unknown to Plaintiffs and not publicly available, but the dates are known to Defendants.

### 4. Certificates of Conformance

109. Defendants BELL, BOEING and RRC were required to verify their suppliers' quality control systems and submit a "Certificate of Conformance" certifying that all component parts were properly inspected and/or verified to comply with specifications.

110. Defendants BELL, BOEING and RRC also submitted their own Certificates of Conformance for assembled parts and systems.

111. The Certificate of Conformance is an essential term of the BELL, BOEING and RRC contracts with the government and it is a standard clause incorporated into the contracts pursuant to 48 C.F.R. § 52.246-15 and 48 C.F.R. § 46.504.

112. The Federal Acquisition Regulations specify that the government should rely on contractor Certificates of Conformance. 48 C.F.R. § 46.504

### G. <u>DEFENDANTS' MATERIAL, INTENTIONAL, MISREPRESENTATIONS AND/OR OMISSIONS.</u>

113. The Interconnect Drive System (ICDS) system in the Osprey requires the interface and control of the RRC engine with the BELL and BOEING airframe components.

114. BELL, BOEING and RRC intentionally misrepresented and/or omitted information about the safety, compatibility and installation of the engine with the ICDS in Interface Control Documents (ICD) provided to NAVAIR.

115. BELL, BOEING and RRC intentionally misrepresented and/or omitted information about the safety, compatibility, and installation of the engine with the clutch assembly in the ICD provided to NAVAIR.

116. BELL and BOEING intentionally misrepresented and/or omitted information about the ICDS, Input Quill Assembly, as well as single and dual hard clutch engagements from the Failure Modes, Effects, and Criticality Analysis (FMECA), Hazard Risk Analysis (HRA), System Safety Assessment (SSA), Critical Safety Item (CSI) list, and Certificates of Conformance provided to NAVAIR.

117. RRC intentionally misrepresented and/or omitted information about the engine's FADEC and the conditions under which it would command an engine shutdown without pilot input, including a single or dual hard clutch engagement, in

the FMECA, HRA, SSA, CSI list and Certificates of Conformance provided to NAVAIR.

118. RRC intentionally misrepresented and/or omitted data about vibrations and powerplant effects in the Flight Clearance documentation and Certificates of Conformance provided to NAVAIR.

119. BELL and BOEING intentionally misrepresented and/or omitted data about vibrations, powerplant effects, fatigue, aircraft component loads, aircraft component strength, aircraft flight envelope; aircraft component service life and reliability in the Flight Clearance documentation and Certificates of Conformance provided to NAVAIR.

### H. THE MILITARY'S CONTRACT AND JUSTIFIABLE RELIANCE UPON DEFENDANTS' INTENTIONAL MISREPRESENTATIONS OR OMISSIONS.

120. Plaintiffs do not have a copy of the contracts between the government and each of the defendants, which are not public documents.

121. Public news sources have reported that BELL, BOEING and RRC were each prime contractors, and not sub-contractors, for the Osprey.

122. The BELL and BOEING joint venture was responsible, by contract, for the Osprey airframe.

123. RRC was responsible, by contract, for the Osprey engines and their interface with the airframe.

124. Under their respective contracts, BELL, BOEING, and RRC were required to provide accurate information, data, and documents for certification as discussed above.

125. In addition, there are uniform contract clauses that are set forth in federal regulations that typically become material parts of government contracts pursuant to 41 U.S.C. § 1303.

126. One of the uniform contract clauses that was incorporated into the BELL, BOEING, and RRC contracts for the accident aircraft is 48 C.F.R. § 252.246-7003.

127. The contract clause incorporated into the BELL, BOEING, and RRC contracts states, in material part:

> **The Contractor** shall provide notification, in accordance with paragraph (c) of this clause, of—
> (1) All nonconformances for parts identified as **critical safety items** acquired by the Government under this contract; and
> (2) All nonconformances or deficiencies that may result in a **safety impact** for systems, or subsystems, assemblies, subassemblies, or parts integral to a system, acquired by or serviced for the Government under this contract.

48 C.F.R. § 252.246-7003(b) (emphasis added).

128. The contract clause provides definitions for the highlighted terms:

> **Critical safety item** means a part, subassembly, assembly, subsystem, installation equipment, or support equipment for a system that contains a characteristic, any failure, malfunction, or absence of which could have a **safety impact**.

> **Safety impact** means the occurrence of death, permanent total disability, permanent partial disability, or injury or occupational illness requiring hospitalization. . . .

48 C.F.R. § 252-246-7003(a) (emphasis added).

129. The material terms of the defendants' contracts require truthful and accurate data **for safety.**

130. The military's contract emphasized that "safety" was an important and material goal of the contract and, more specifically, that "safety impact" meaning "death, permanent total disability, permanent partial disability, or injury or occupational illness requiring hospitalization" were **critical and material** items of emphasis.

131. Contract clause 48 C.F.R. § 252-246-7003 puts the duty upon **the Contractor** to provide information to the military because **the Contractor** is in a position of superior knowledge than the military.

132. Contract clause 48 C.F.R. § 46.504 specifically allows the government contracting officer to rely upon the contractor's Certificates of Conformance in lieu of a detailed government inspection to show compliance with specifications.

133. The **military** justifiably relied upon the intentional, material, misrepresentations or omissions of the defendants because of their long history of design, development, and manufacture of military products in general and because of their provision of Osprey data and information per the specific contracts at issue.

134. **Plaintiffs' decedents were all military members** and the contract, per its stated and material terms, was for their benefit and, as members of the military, each of them individually justifiably relied upon the intentional misrepresentations and omissions of BELL, BOEING, and RRC as specifically stated above in paragraphs 93 to 123.

**COUNT I – STRICT LIABILITY (Manufacturing Defect)**
***Plaintiffs v. All Defendants***

135. Plaintiffs incorporate by reference each prior and subsequent allegation as though fully set forth herein.

136. At all times material all Defendants, and each of them, were in the business of designing, developing, manufacturing, assembling, testing, servicing, distributing, supplying, and/or selling the airframe, engines, propellers, and component parts of V-22 Osprey aircraft, including SWIFT 11, and providing accompanying product support, airworthiness materials, maintenance materials, operating instructions and procedures, and abnormal/emergency procedures.

137. At all times material all Defendants, and each of them, are liable to Plaintiffs under the theory of Strict Liability in that:

a. SWIFT 11, the entire aircraft, was defective and unreasonably dangerous because it did not meet the government's specifications for manufacture, production, delivery, acceptance, service life, operation, durability, endurance, or reliability;

b. SWIFT 11, the entire aircraft, was defective and unreasonably dangerous because it failed to conform to the design criteria of the product by allowing a dual HCE;

c. SWIFT 11, the entire aircraft, was defective and unreasonably dangerous because it failed to conform to its design criteria by allowing a single HCE to result in a catastrophic and uncontrollable condition;

d. SWIFT 11, the entire aircraft, was defective and unreasonably dangerous because it failed to conform to its design criteria by allowing a single engine failure to result in a catastrophic and uncontrollable condition;

e. SWIFT 11, the entire aircraft, was defective and unreasonably dangerous because it failed to conform to its design criteria by allowing an ICDS failure to result in a catastrophic and uncontrollable condition;

f. the input quill assembly\assemblies onboard SWIFT 11 were defective and unreasonably dangerous because they did not meet the government's specifications for manufacture, production, delivery, acceptance, service life, operation, durability, endurance, or reliability;

g. the input quill assembly\assemblies onboard SWIFT 11 were defective and unreasonably dangerous because it/they failed to conform to its/their design criteria by allowing internal slippage to result in an HCE;

h. the clutch assemblies onboard SWIFT 11 were defective and unreasonably dangerous because they did not meet the government's specifications for manufacture, production, delivery, acceptance, service life, operation, durability, endurance, or reliability;

i. the clutch assemblies onboard SWIFT 11 were defective and unreasonably dangerous because an internal slippage resulted in an HCE;

j. the ICDS onboard SWIFT 11 was defective and unreasonably dangerous because it did not meet the government's specifications for manufacture, production, delivery, acceptance, service life, operation, durability, endurance, or reliability;

k. the ICDS onboard SWIFT 11 was defective and unreasonably dangerous because it failed to conform to its design criteria by allowing an asymmetric thrust condition when a single engine failed;

l. the ICDS onboard SWIFT 11 was defective and unreasonably dangerous because it failed to conform to its design criteria by allowing a single HCE to result in a catastrophic and uncontrollable condition;

m. the engines onboard SWIFT 11 were defective and unreasonably dangerous because they did not meet the government's specifications for manufacture, production, delivery, acceptance, service life, operation, durability, endurance, or reliability;

n. the engines onboard SWIFT 11 were defective and unreasonably dangerous because the FADEC commanded that one engine shut down and the other remain running during a dual HCE event;

o. the defect and unreasonably dangerous conditions in the aircraft, engines, ICDS, clutch assemblies, and input quill assemblies caused the deaths of Plaintiffs' decedents and Plaintiff's damages;

p. the defect and unreasonably dangerous condition in the aircraft, engines, ICDS, clutch assemblies, and input quill assemblies existed at the time the system left Defendants' possession and was supplied to the government;

q. the defect and unreasonably dangerous condition in the aircraft, engines, ICDS, clutch assemblies, and input quill assemblies were not substantially changed on the day of the Accident;

r. the entire airplane was defective and unreasonably dangerous due to the flaw in the systems and components that were integrated into it; and/or

s. the engine/clutch assembly/ICDS interface was defective and unreasonably dangerous due to the flaw in the input quill assembly that was integrated into them.

138. As a direct and or proximate result of the defective and unreasonably dangerous condition of the aircraft, engines, FADECs, ICDS, clutch assemblies, and/or input quill assemblies, all Plaintiffs, and each of them, have suffered pecuniary and non-pecuniary damages exceeding $75,000.00.

WHEREFORE, Plaintiffs, and each of them, respectfully request judgment in their favor against all Defendants, and each of them, for all damages, costs, and expenses allowable under the law.

## COUNT II – STRICT LIABILITY (Design Defect)
***Plaintiffs v. All Defendants***

139. Plaintiffs incorporate by reference each prior and subsequent allegation as though fully set forth herein.

140. At all times material all Defendants, and each of them, were in the business of designing, developing, manufacturing, assembling, testing, servicing, distributing, supplying, and/or selling the airframe, engines, propellers, and component parts of V-22 Osprey aircraft and SWIFT 11 and providing accompanying product support, airworthiness materials, maintenance materials, operating instructions and procedures, and abnormal/emergency procedures.

141. At all times material all Defendants, and each of them, are liable to Plaintiffs under the theory of Strict Liability in that:

a. SWIFT 11, the entire aircraft and all of its component parts, was defective and unreasonably dangerous because it was designed with a flaw that allowed a dual HCE event to occur;

b. SWIFT 11, the entire aircraft and all of its component parts, was defective and unreasonably dangerous because it did not perform as safely as an ordinary pilot would expect when used as intended because it was designed with a flaw that allowed a dual HCE event to occur;

c. SWIFT 11, the entire aircraft and all of its component parts, was defective and unreasonably dangerous because it was designed with a flaw that allowed an uncontrollable asymmetric power condition to occur;

d. SWIFT 11, the entire aircraft and all of its component parts, was defective and unreasonably dangerous because it did not perform as safely as an ordinary pilot would expect when used as intended because it was designed with a flaw that allowed an uncontrollable asymmetric power condition to occur;

e. SWIFT 11, the entire aircraft and all of its component parts, was defective and unreasonably dangerous because it was designed with a flaw that allowed a single HCE to result in a catastrophic and uncontrollable condition;

f. SWIFT 11, the entire aircraft and all of its component parts, was defective and unreasonably dangerous because it did not perform as safely as an ordinary pilot would expect when used as intended because it was designed with a flaw that allowed a single HCE to result in a catastrophic and uncontrollable condition;

g. the engines and FADECs onboard SWIFT 11 were defective and unreasonably dangerous because they were designed with a flaw that allowed an engine shutdown to occur without command from the pilot;

h. the engines, FADECs onboard SWIFT 11 were defective and unreasonably dangerous because they did not perform as safely as an ordinary pilot would expect when used as intended because it was designed with a flaw that allowed an engine shutdown to occur without command from the pilot;

i. the ICDS onboard SWIFT 11 was defective and unreasonably dangerous because it was designed with a flaw and without redundancy that allowed a catastrophic asymmetric thrust condition;

j. the ICDS onboard SWIFT 11 was defective and unreasonably dangerous because it did not perform as safely as an ordinary pilot would expect when used as intended because it was designed with a flaw and without redundancy that allowed a catastrophic asymmetric thrust condition;

k. the defects and unreasonably dangerous condition in the aircraft, engines, ICDS, and/or other systems caused the crash of SWIFT 11, the deaths of Plaintiffs' decedents, and Plaintiffs' damages;

l. the defects and unreasonably dangerous condition in the aircraft, engines, ICDS, and/or other systems existed at the time those items left Defendants' possession and was supplied to the government; and/or

m. the defect and unreasonably dangerous condition aircraft, engines, ICDS, and/or other systems was not substantially changed on the day of the Accident.

142. As a direct and proximate result of the defective and unreasonably dangerous condition of the aircraft, engines, ICDS, and/or other systems, Plaintiffs, and each of them, have suffered pecuniary and non-pecuniary damages exceeding $75,000.00.

WHEREFORE, Plaintiffs, and each of them, respectfully request judgment in their favor against all Defendants, and each of them, for all damages, costs, and expenses allowable under the law.

**COUNT III – STRICT LIABILITY (Failure to Warn)**
***Plaintiffs v. All Defendants***

143. Plaintiffs incorporate by reference each prior and subsequent allegation as though fully set forth herein.

144. At all times material all Defendants, and each of them, were in the business of designing, developing, manufacturing, assembling, testing, servicing, distributing, supplying, and/or selling the airframe, engines, propellers, and component parts of V-22 Osprey aircraft and SWIFT 11 and providing accompanying product support, airworthiness materials, maintenance materials, operating instructions and procedures, and abnormal/emergency procedures.

145. At all times material all Defendants, and each of them, are liable to Plaintiffs under the theory of Strict Liability in that:

a. SWIFT 11, the entire aircraft and all of its component parts, was defective and unreasonably dangerous because it lacked a suitable warning that a catastrophic loss of control would occur;

b. SWIFT 11, the entire aircraft and all of its component parts, was defective and unreasonably dangerous because it lacked a suitable warning that an HCE and/or dual HCE event would occur;

c. SWIFT 11, the entire aircraft and all of its component parts, was defective and unreasonably dangerous because they lacked a suitable warning that an uncontrollable asymmetric power condition would occur;

d. SWIFT 11, the entire aircraft and all of its component parts, was defective and unreasonably dangerous because they lacked a suitable warning that a single HCE would result in a catastrophic and uncontrollable condition;

e. the engines and FADECs onboard SWIFT 11 were defective and unreasonably dangerous because they lacked a suitable warning that an engine shutdown could occur without command from the pilot;

f. the ICDS onboard SWIFT 11 was defective and unreasonably dangerous because it lacked a suitable warning that it was designed without redundancy; and/or

g. the ICDS onboard SWIFT 11 was defective and unreasonably dangerous because it lacked a suitable warning that it could cause a catastrophic asymmetric thrust condition.

146. As a direct and proximate result of the lack of suitable warnings regarding the aircraft, engines, ICDS, and/or other systems, Plaintiffs, and each of them, have suffered pecuniary and non-pecuniary damages exceeding $75,000.00.

WHEREFORE, Plaintiffs, and each of them, respectfully request judgment in their favor against all Defendants, and each of them, for all damages, costs, and expenses allowable under the law.

## COUNT IV – NEGLIGENCE
### *Plaintiffs v. All Defendants*

147. Plaintiffs incorporate by reference each prior and subsequent allegation as though fully set forth herein.

148. At all times material all Defendants, and each of them, had legal duties to use reasonable care in the design, manufacture, sale and/or supply the aircraft,

engines, propellers, systems, and component parts of V-22 Osprey aircraft and SWIFT 11.

149. At all times material all Defendants, and each of them, breached their legal duties and failed to use reasonable care in the design, manufacture, sale, supply, and upkeep of the aircraft, engines, propellers, systems, and component parts of SWIFT 11 in that:

a. Defendants failed to properly and adequately design aircraft, engines, FADECs, transmission, clutch, ICDS, and other systems and their component parts to work together;

b. Defendants failed to properly integrate the airframe, engines, FADECs, transmission, clutch, ICDS, and other systems and their component parts to work together as intended;

c. Defendants failed to properly and adequately manufacture aircraft, engines, FADECs, transmission, clutch, ICDS, and other systems and their component parts that operated as intended and as designed;

d. Defendants designed a system or parts of a system that allowed an HCE event to occur;

e. Defendants manufactured and/or supplied a system or parts of a system that allowed an HCE event to occur;

f. Defendants designed a system or parts of a system that allowed a catastrophic asymmetric thrust condition;

g. they manufactured and/or supplied a system or parts of a system that allowed a catastrophic asymmetric thrust condition;

h. Defendants fielded a system or parts of a system with a single point of failure without adequate redundancy or safeguards;

i. Defendants fielded a system or parts of a system with a single point of failure without adequate warnings, instructions, or emergency procedures;

j. Defendants failed to properly analyze and/or test the aircraft, engines, FADECs, transmission, clutch, ICDS, and other systems and their component parts;

k. Defendants failed to properly troubleshoot known problems with the aircraft, engines, FADECs, transmission, clutch, ICDS, and other systems and their component parts;

l. Defendants failed to adequately correct known defects in the aircraft, engines, FADECs, transmission, clutch, ICDS, and other systems and their component parts;

m. Defendants failed to adequately monitor the performance of the aircraft, engines, FADECs, transmission, clutch, ICDS, and other systems and their component parts to ensure that they worked together properly;

n. Defendants failed to adequately monitor the performance of the aircraft, engine, FADECs, transmission, clutch, ICDS, and other systems and their component parts to ensure that they operated properly;

o. Defendants failed to properly and adequately take all reasonable steps to provide the flight crew with redundancy and backup systems in the event of a system malfunction;

p. Defendants failed to provide appropriate operating instructions, operating limitations; operating procedures; and emergency procedures for an asymmetric thrust condition;

q. Defendants failed to timely, accurately, and truthfully apprise the government and military service members of the dangers in the aircraft, engines, FADECs, transmission, clutch, ICDS, and other systems and their component parts about which they knew or reasonably should have known about;

r. Defendants failed to timely correct the dangers in the aircraft, engine, transmission, clutch, ICDS, and other systems and their component parts about which they knew or reasonably should have known;

s. Defendants failed to include warnings that a reasonably prudent manufacturer, assembler, supplier, or seller would include about the aircraft's catastrophic loss of control;

t. Defendants failed to include warnings that a reasonably prudent manufacturer, assembler, supplier, or seller would include about a dual HCE event;

u. Defendants failed to include warnings that a reasonably prudent manufacturer, assembler, supplier, or seller would include about an uncontrollable asymmetric power condition;

v. Defendants failed to include warnings that a reasonably prudent manufacturer, assembler, supplier, or seller would include about a single HCE event that would cause a catastrophic and uncontrollable condition;

w. Defendants failed to include warnings that a reasonably prudent manufacturer, assembler, supplier, or seller would include about an engine shutdown that was not commanded by the pilot;

x. Defendants failed to include warnings that a reasonably prudent manufacturer, assembler, supplier, or seller would include about the lack of redundancy in the ICDS and other systems; and/or

150. Defendants failed to include warnings that a reasonably prudent manufacturer, assembler, supplier, or seller would include about the ICDS'

propensity to cause a catastrophic asymmetric thrust condition. As a direct and proximate result of the defendants' individual and/or collective breaches of duties, Plaintiffs, and each of them, have suffered damages pecuniary and non-pecuniary damages exceeding $75,000.00.

WHEREFORE, Plaintiffs, and each of them, respectfully request judgment in their favor against All Defendants, and each of them, for all damages, costs, and expenses allowable under the law.

## <u>COUNT V – NEGLIGENT MISREPRESENTATION</u>

***Plaintiffs v. All Defendants***

151. Plaintiffs incorporate by reference each prior and subsequent allegation as though fully set forth herein.

152. At all times material all Defendants, and each of them, had a pecuniary interest in their design, manufacture, sale, supply, repair, troubleshooting, maintenance, technical representation, airworthiness assessments, and reporting to the government about V-22 Osprey aircraft, engines, FADECs, transmission, clutch, ICDS, and other systems and their component parts.

153. At all times material all Defendants, and each of them, had a superior knowledge than the government had about the V-22 Osprey aircraft, engines, FADECs, transmission, clutch, ICDS, and other systems and their component parts.

154. At all times material all Defendants, and each of them, supplied information to the military knowing that the military would justifiably rely on their

information as guidance for the acquisition and operation of V-22 Osprey aircraft, engines, FADECs, transmission, clutch, ICDS, and other systems and their component parts including those on SWIFT 11.

155. At all times material Plaintiffs' decedents were military members.

156. By virtue of the defendants' position of superior knowledge about the V-22 Osprey aircraft, engines, FADECs, transmission, clutch, ICDS, and other systems and their component parts, the government justifiably relied upon their false statements, information, and/or misrepresentations.

157. At all times material all Defendants, and each of them, had legal duties to make truthful statements, to supply truthful information, and to use reasonable care and competence in communicating information to the government and to service members about the design, operation, and safety of the aircraft, engines, FADECs, transmission, clutch, ICDS, and other systems of SWIFT 11.

158. At all times material all Defendants, and each of them, breached their legal duties and failed to make truthful statements and/or provided false information without reasonable grounds for believing them to be true and failed to use reasonable care and competence in communicating information to the government and to service members in that:

a. Defendants failed to truthfully, properly, adequately, and timely apprise the government and service members about the lack of safety in the

aircraft, engines, FADECs, transmission, clutch, ICDS, and other systems in V-22 Osprey aircraft and SWIFT 11;

b. Defendants supplied false information about the safety of the aircraft, engines, FADECs, transmission, clutch, ICDS, and other systems in V-22 Osprey aircraft and SWIFT 11;

c. they failed to use reasonable care in their communications to the government and service members about the safety of the aircraft, engines, FADECs, transmission, clutch, ICDS, and other systems in V-22 Osprey aircraft and SWIFT 11;

d. Defendants failed to truthfully, properly, adequately, and timely apprise the government and service members about the propensity for and likelihood of clutch slippage/failure, dual HCE events, catastrophic asymmetric thrust events, and uncommanded engine shutdowns in V-22 Osprey aircraft and SWIFT 11;

e. Defendants supplied false information about the propensity for and likelihood of clutch slippage/failure, HCE and dual HCE events, catastrophic asymmetric thrust events, and uncommanded engine shutdowns in V-22 Osprey aircraft and SWIFT 11;

f. Defendants failed to truthfully, properly, adequately, and timely apprise the government and service members about the lack of redundancy

that allowed HCE and dual HCE events and catastrophic asymmetric thrust events in V-22 Osprey aircraft and SWIFT 11;

g. Defendants supplied false information about the lack of redundancy that allowed HCE and dual HCE events and catastrophic asymmetric thrust events in V-22 Osprey aircraft and SWIFT 111;

h. Defendants failed to use reasonable care in their communications to the government about the lack of redundancy that allowed HCE and dual HCE events and catastrophic asymmetric thrust events in V-22 Osprey aircraft and SWIFT 11;

i. after previous reports of clutch slippage/failure and HCE events in V-22 Osprey aircraft Defendants failed to truthfully, properly, adequately, and timely apprise the government and service members about the true nature of the problem, the grossly unsafe condition that existed in V-22 Osprey aircraft; and the true risk that the problem would cause grave harm including loss of life;

j. after previous reports of clutch slippage/failure and HCE events in V-22 Osprey aircraft Defendants knowingly supplied false information about the true nature of the problem, the grossly unsafe condition that existed in V-22 Osprey aircraft; and the true risk that the problem would cause grave and/or catastrophic harm including loss of life; and/or

k. after previous reports of clutch slippage/failure and HCE events aircraft Defendants failed to use reasonable care in their communications to the government and service members about the true nature of the problem, the grossly unsafe condition that existed in V-22 Osprey aircraft; and the true risk that the problem would cause grave and/or catastrophic harm including loss of life.

159. As a direct and proximate result of the defendants' individual and/or collective breaches of duties, their misrepresentations and/or their negligent supply of false information, Plaintiffs, and each of them, have suffered pecuniary and non-pecuniary damages exceeding $75,000.00.

WHEREFORE, Plaintiffs, and each of them, respectfully request judgment in their favor against All Defendants, and each of them, for all damages, costs, and expenses allowable under the law.

## COUNT VI – FRAUDULENT MISREPRESENTATION
***Plaintiffs v. All Defendants***

160. Plaintiffs incorporate by reference each prior and subsequent allegation as though fully set forth herein.

161. At all times material all Defendants, and each of them, had legal duties to make truthful statements to the military about the design, operation, and safety of V-22 Osprey aircraft, engines, FADECs, transmission, clutch, ICDS, and other systems and their component parts.

162. At all times material Plaintiffs' decedents were military members.

163. At all times material all Defendants, and each of them, intentionally and/or recklessly made false statements of material fact as follows:

a. Defendants failed to truthfully, properly, adequately, and timely apprise the government and service members about the lack of safety in the aircraft, engines, FADECs, transmission, clutch, ICDS, and other systems in V-22 Osprey aircraft and SWIFT 11;

b. Defendants failed to truthfully, properly, adequately, and timely apprise the government and service members about the propensity for and likelihood of clutch slippage/failure, HCE and dual HCE events, catastrophic asymmetric thrust events, and uncommanded engine shutdowns in V-22 Osprey aircraft and SWIFT 11;

c. Defendants failed to truthfully, properly, adequately, and timely apprise the government and service members about the lack of redundancy and single point of failure in the ICDS that allowed HCE and dual HCE events and catastrophic asymmetric thrust events in V-22 Osprey aircraft and SWIFT 11; and/or

d. after previous reports of clutch slippage/failure and HCE events in V-22 aircraft Defendants failed to truthfully, properly, adequately, and timely apprise the government and service members about the true nature of

the problem, the grossly unsafe condition that existed in V-22 aircraft; and the true risk that the problem would cause grave and/or catastrophic harm including loss of life.

164. All Defendants, and each of them individually, knew that the material facts that they made were false when they made those statements.

165. All Defendants, and each of them individually, intentionally and/or recklessly made false statements of material fact intending that the government and that service members would rely upon those misrepresentations.

166. The government actually relied on the defendants' intentionally and/or recklessly false statements and the government fielded an unsafe and unairworthy aircraft and allowed service members to fly in those unsafe and unairworthy aircraft.

167. Service members, including Plaintiffs' decedents actually relied on the defendants' intentionally and/or recklessly false statements and they actually flew in unsafe and unairworthy aircraft.

168. The government's and Plaintiffs' decedents' reliance upon the defendants' intentional and/or reckless false statements was a direct and proximate cause of the crash of SWIFT 11 and the deaths of Plaintiffs' decedents.

169. As a direct and proximate result of the defendants' individual and/or collective intentional and/or reckless acts, Plaintiffs, and each of them, have suffered pecuniary and non-pecuniary damages exceeding $75,000.00.

WHEREFORE, Plaintiffs, and each of them, respectfully request judgment in their favor against all Defendants, and each of them, for all damages, costs, and expenses allowable under the law including punitive damages for intentional and/or reckless misconduct.

**<u>COUNT VII– BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY</u>**
***Plaintiffs v. All Defendants***

170. Plaintiffs incorporate by reference each prior and subsequent allegation as though fully set forth herein.

171. At all times material all Defendants were merchants that were in the business of selling and/or supplying goods to the United States government and the military.

172. At all times material Plaintiffs' decedents were military members.

173. There existed at the time of this Accident a warranty of merchantability that was implied from the contracts that were entered into between the United States government and these defendants and/or between the defendants themselves regardless of any writing to eliminate or limit that warranty.

174. The warranty of merchantability was breached by these defendants because SWIFT 11 was not of fair or average quality of other aircraft made by competitors, its engines, transmissions, clutches, ICDS, and other systems were not of fair or average quality of those made by competitors and SWIFT 11 was in this

substandard and unmerchantable condition at the time of its initial sale and/or supply.

175. As a direct and proximate result of the defendants' breach of the warranty of merchantability, SWIFT 11 crashed, Plaintiffs, and each of them, have suffered pecuniary and non-pecuniary damages exceeding $75,000.00.

WHEREFORE, Plaintiffs, and each of them, respectfully request judgment in their favor against all Defendants, and each of them, for all damages, costs, and expenses allowable under the law.

**COUNT VIII – BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE**

***Plaintiffs v. All Defendants***

176. Plaintiffs incorporate by reference each prior and subsequent allegation as though fully set forth herein.

177. At all times material all Defendants were merchants that were in the business of selling and/or supplying goods and specifically aircraft to the United States government and the military.

178. At all times material Plaintiffs' decedents were military members.

179. At all times material the United States government and the military knew that all Defendants were skilled in the provision of aircraft, engines, transmissions, clutches, ICDS, and other systems and that is why these defendants were awarded contracts for the provision of SWIFT 11 and its component parts.

180. At all times material the United States government and the military relied upon all Defendants to provide aircraft, engines, transmissions, clutches, ICDS, and other systems that were fit for their intended purpose which was safe flight.

181. There existed at the time of this Accident a warranty of fitness for a particular purpose that was implied from the contracts that were entered into between the United States government and these defendants and/or between the defendants themselves regardless of any writing to eliminate or limit that warranty.

182. The warranty of fitness for a particular purpose was breached by these defendants because SWIFT 11 was not fit for the specific purpose intended which was safe flight.

183. As a direct and proximate result of the defendants' breach of the warranty of fitness for a particular purpose, SWIFT 11 crashed, Plaintiffs, and each of them, have suffered pecuniary and non-pecuniary damages exceeding $75,000.00..

WHEREFORE, Plaintiffs, and each of them, respectfully request judgment in their favor against all Defendants, and each of them, for all damages, costs, and expenses allowable under the law.

**<u>COUNT IX– BREACH OF CONTRACT</u>**
***Plaintiffs v. All Defendants***

184. Plaintiffs incorporate by reference each prior and subsequent allegation as though fully set forth herein.

185. The United States government and the military entered into valid, performance-only contracts with these defendants for the design, manufacture, maintenance, repair, upkeep, troubleshooting, and supply of V-22 Osprey aircraft, engines, FADECs, transmission, clutch, ICDS, and other systems and their component parts including for the supply of SWIFT 11 and its systems.

186. Plaintiffs do not have a copy of the contracts, but they have sufficient information to form a reasonable belief that such contracts exist from the press releases, internet pages, advertisements, and news stories from and about these defendants.

187. The performance-only contracts did not specify the precise manner of design, construction, manufacture, maintenance, repair, upkeep, troubleshooting, or supply of the V-22 Osprey engines, FADECs, transmission, clutch, ICDS, and other systems and their component parts.

188. The purpose of the contracts was to provide the government and military with engines, FADECs, transmission, clutch, ICDS, and other systems and their component parts that would provide a safe, airworthy and superior all-weather, land- and sea-based multi-mission airborne platforms.

189. The design, manufacture, testing, and systems integration of engines, FADECs, transmission, clutch, ICDS, and other systems and their component parts were the responsibility of these defendants pursuant to the contracts.

190. One material objective of the contracts was the provision of an aircraft that was airworthy and safe for flight.

191. It was the clear and/or manifest intention of the contracting parties that the contracts included material provisions for the safety, airworthiness, fitness, suitability, and merchantability of the V-22 Osprey engines, FADECs, transmission, clutch, ICDS, and other systems and their component parts which primarily and directly benefited the aircrew who flew and who fly in the plane.

192. Plaintiffs' decedents were V-22 Osprey aircrew and were military members who were the subject of the contracts and the specific clauses that required safety; as military members Plaintiffs' decedents were first-party beneficiaries of the contracts because there is privity of contract with the defendants and the military and the decedents were military members.

193. In the alternative, Plaintiffs' decedents were third-party beneficiaries of the safety guarantees contracts between these defendants and the United States government.

194. It was the objective, purpose and specific intention of the parties to the contracts that the beneficiaries of the contracts were the flight crew of the V-22 Osprey aircraft, the flight crew of SWIFT 11, and Plaintiffs' decedents.

195. The defendants breached their contracts for the creditor beneficiaries Plaintiffs' decedents by failing to meet their obligations as set forth herein because SWIFT 11 was unsafe, defective, lacked adequate instructions and/or warnings.

196. The defendants breached their contracts for the creditor beneficiaries Plaintiffs' decedents by failing to meet their obligations as set forth herein because SWIFT 11 was designed, manufactured, supplied, fielded, troubleshot, repaired, maintained, and upkept by these defendants with a lack of reasonable care as required by the contracts.

197. The defendants breached their contracts for the creditor beneficiaries Plaintiffs' decedents by failing to meet their obligations as set forth herein because the defendants intentionally, recklessly and/or negligently provided false information about the safety, airworthiness, and reliability of V-22 Osprey aircraft, engines, FADECs, transmission, clutch, ICDS, and other systems and their component parts.

198. As a direct and proximate result of these defendants' breaches of their contracts, SWIFT 11 crashed, Plaintiffs' decedents lost their lives, and Plaintiffs,

and each of them, have suffered pecuniary and non-pecuniary damages exceeding $75,000.00.

WHEREFORE, Plaintiffs, and each of them, respectfully request judgment in their favor against all Defendants, and each of them, for all damages, costs, and expenses allowable under the law.

## PRAYER FOR RELIEF

1. For general damages according to proof;
2. For special damages according to proof;
3. For personal property damages according to proof;
4. For pre-death pain, suffering, and disfigurement pursuant to California Code of Civil Procedure § 377.24;
5. For costs of the decedent's funeral, burial, and related expenses according to proof;
6. For prejudgment interest as allowed by law;
7. For costs incurred herein; and
8. For such other and further relief as this Court may deem just and proper.

Dated: May 18, 2026

By: /s/ Timothy A. Loranger

Timothy A. Loranger
tloranger@wisnerbaum.com
Ari S. Friedman
afriedman@wisnerbaum.com
WISNER BAUM LLP
11111 Santa Monica Blvd. Ste. 1750
Los Angeles, CA 90025

Telephone: (310) 207-3233

and
John J. Gagliano (*pro hac vice*)
GAGLIANO LAW OFFICES
433 Plaza Real, Suite 275
Boca Raton, FL 33432
Telephone (561) 765-6170

Attorneys for Plaintiffs

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby respectfully demand that a jury trial be conducted with respect to all issues and claims.

Dated: May 18, 2026

By: /s/ Timothy A. Loranger
Timothy A. Loranger
tloranger@wisnerbaum.com
Ari S. Friedman
afriedman@wisnerbaum.com
WISNER BAUM LLP
11111 Santa Monica Blvd. Ste. 1750
Los Angeles, CA 90025
Telephone: (310) 207-3233

and

John J. Gagliano (*pro hac vice*)
GAGLIANO LAW OFFICES
433 Plaza Real, Suite 275
Boca Raton, FL 33432
Telephone (561) 765-6170

Attorneys for Plaintiffs